## Marvin Faulkner v. The State.

### No. 4018.   Decided March 18, 1908.

**1.—Seduction—Jury and Jury Law—Challenge for Cause.**

Upon trial for seduction, during the empanelment of the jury, where one of the jurors upon his voir dire stated in answer to a question from defendant's counsel that he would not convict defendant if the prosecutrix willingly had carnal intercourse with the defendant, there was no error in sustaining an exception by the State to a further question to the juror, if defendant merely had intercourse with prosecutrix willingly, would he hesitate in returning a verdict of not guilty.

**2.—Same—Evidence—Acts of Defendant.**

Upon trial for seduction, there was no error to show that in his actions towards prosecutrix defendant was affectionate, etc., as a true lover should be.

**3.—Same—Evidence—Promise of Marriage.**

Upon trial for seduction there was no error in admitting testimony as to a promise of marriage between the defendant and the prosecutrix, and fixing the time for marriage.

**4.—Same—Evidence—Cross-Examination.**

Upon trial for seduction, testimony as to the physical condition of prosecutrix was admissible to explain why she wrote a certain letter in evidence, especially where such testimony was brought out by counsel for the State on re-direct examination after cross-examination by defendant upon the same subject.

**5.—Same—Charge of Court—Definition of Offense.**

Where upon trial for seduction the evidence showed on the part of prosecutrix promises of marriage by defendant, there was no error in the court's charge that seduction means an enticement of a woman on the part of a man to surrender her chastity by means of some art, influence, promise or deception, calculated to accomplish that object, and to include the yielding of her person to him, as much as if it was expressly stated.

**6.—Same—Charge of Court.**

Where upon trial for seduction the charge of the court was a proper and entirely correct presentation of the law, there was no error.

**7.—Same—Sufficiency of Evidence.**

Where upon trial for seduction, the prosecutrix' claim of a promise of marriage by defendant, etc., was sufficiently corroborated by the circumstances in the case, such as the flight of defendant, his clandestine visits to prosecutrix after the institution of the prosecution trying to ascertain what she was going to swear, and nowhere placing himself in an attitude showing innocence, and his admission that he debauched prosecutrix, etc., were sufficient to sustain a conviction for seduction. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Clay. Tried below before the Hon. A. H. Carrigan.

Appeal from a conviction of seduction; penalty seven years imprisonment in the penitentiary.

The opinion states the case.

*Hoover & Taylor,* and *Abernathy & Mangum,* for appellant.— A woman must surrender her virtue upon or by reason of a promise of marriage, and a person cannot be guilty of the offense of seduction unless he obtains carnal intercourse with such woman by reason of such a promise of marriage and the statute of this State makes that the only moving cause. Penal Code, art. 967; Nolan v. State, 48 Texas Crim. Rep., 436; 13 Texas Ct. Rep., 735; Barnes v. State, 37 Texas Crim. Rep., 320.

To sustain a conviction for seduction the State must corroborate the testimony of the prosecutrix on the vital issues which are that of carnal intercourse and promise of marriage, and this must be done beyond a reasonable doubt. Spenrath v. State, 48 S. W. Rep., 193; Howe v. State, 51 Texas Crim. Rep., 174; 19 Texas Ct. Rep., 152 (dissenting opinion), On question of previous promise. People v. Bressler, 91 N. W. Rep., 639; Pope v. State, 137 Ala., 56; People v. Payne, 131 Michigan, 474. On question of corroboration of prosecutrix. Carrens v. State, 91 S. W. Rep., 30; Tooney v. State, 5 Texas Crim. App., 163.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of seduction and his punishment assessed at seven years confinement in the State penitentiary.

Bill of exceptions No. 1 complains that while the defendant was examining the jurors upon their voir dire, the defendant's counsel asked each of the jurors the following question: "Now, if you should be selected as a juror in this case, and the proof should show that the defendant, Marvin Faulkner, did have carnal intercourse with the prosecutrix (Florence Rodden), but that it was not under the promise of marriage, then would that fact alone, prejudice you against the defendant's testimony and against his case; and would that fact alone influence your verdict against the defendant?" The State's counsel objected to the question because same was seeking to forestall the verdict of the jury in said cause. The bill is approved with this explanation: "The question propounded to the jurors, and objection above stated are not correct. Appellant's counsel asked the jurors the following question: 'Mr. Campbell, if the proof should show in this case, that the defendant did have carnal intercourse with this girl, and she did give birth to a child after that, would that influence your verdict. Then I ask you this question: 'I said to you, the law does not make it an offense for a boy to have carnal intercourse with a girl, so that she is over the age of

sixteen. Now then, would you in this case, hesitate in returning a verdict of not guilty against the defendant, if the testimony showed that this act of carnal intercourse was willingly entered into between the prosecutrix and the defendant?' " State's counsel objected to that question because it is not a proper question. The question asked is very much involved. It seems that the juror had answered that if the proof should show in this case that the defendant did have carnal intercourse with this girl and she did give birth to a child, afterwards, that said facts would not influence him in finding a verdict. Then he asked the juror if he merely had intercourse with her willingly would he hesitate in returning a verdict of not guilty against the defendant. If the first question was proper the latter was too, for first answer necessarily includes a negative answer to the last question. So we see no error in the ruling of the court.

Bill No. 2 shows that while prosecutrix, Florence Rodden, was upon the stand testifying in said cause, the State's counsel asked the witness the following question: "In his actions towards you, state to the jury whether or not he appeared affectionate or loving, kind and true, as a lover should?" The testimony is admissible.

Bill No. 3 shows that the State's counsel asked the prosecutrix the following questions: "Q. State to the jury whether or not you did believe at that time that you were going to marry and become man and wife in the spring? A. I did. Q. At that time Miss Rodden, had the date of your marriage been definitely fixed between you? A. No, sir. Q. Later on was the time set? A. Yes. Q. How many times did you and he set a time to get married? A. I do not know just how many times. Several times, though. Q. Now state to the jury whether these times were fixed according to his suggestions or according to your suggestions."

Thereupon appellant objected to any testimony as to a promise of marriage between the appellant and the prosecutrix, or as to the fixing of the time of marriage, because irrelevant and immaterial, and calculated to prejudice the rights of the appellant. These questions were entirely germane to this prosecution and legitimate.

Bill No. 4 shows that while the prosecutrix was being examined, the State's counsel asked the following questions: "Q. How old was your baby? A. He was three weeks old. Q. What was your physical condition at that time?" Appellant objected because same was irrelevant and immaterial and calculated to prejudice the rights of the appellant. The witness answered: "I was not very strong. I was not able to do any work." The above bill is approved with this explanation: "The above testimony was brought out by counsel for the State on redirect examination, after defendant, on cross-examination of said witness, had asked her the following questions and received the following answers:

" 'Q. Your father drove you away from home when your baby was two weeks old? A. It was three weeks old. Q. It was your own father, was it not? A. Yes. Q. He carried you to Bowie, did he not? A. Yes.

Q. He left you in the depot at Bowie, did he not? A. Yes. Q. He left you in the depot at Bowie with that three weeks old baby without any one to accompany you? A. No, sir. He did not. Q. Who was with you? A. My uncle. Q. Where is the uncle? A. He is at Iredell. Q. He has been here each time before? A. He was here one time. Q. Then your uncle came over to your home when your father put you out and he came back to Bowie with you? A. Yes. Q. In other words, your father carried you and your uncle to Bowie away from your home? A. Yes. Q. You went with your uncle to his home? A. No, sir, I went to Fort Worth. Q. Where did he leave you there? A. He got me a place to board for a month. Q. After that month your father sent for you? A. No, sir, I got a place to work there in a family. Q. How long did you stay in Fort Worth? A. Nine months.' "

We do not think there was any harm done appellant, to say the least of it, by the introduction of this testimony, yet we fail to see the force or the materiality thereof. It was not permissible to prove that her father drove her away from home on account of her disgrace and shame, if he was base enough to do so, and therefore it was immaterial what her physical condition, but we can readily see that this testimony might be admissible on one theory suggested by the evidence in this case. After the birth of the prosecutrix' child, she wrote a letter, "To whom it may concern," and left same in her home, which letter was found and thoroughly identified as having been written by prosecutrix—in fact she confesses that she wrote it—in which she makes some statements at variance with her testimony on the trial of the case. Therefore, it would be material to show her physical condition at the time of writing that letter.

Bill No. 5 shows that the State's counsel asked the prosecutrix the following questions: "Q. Where did you board at Fort Worth? A. At Mrs. Reynolds'. Q. After that time, when you got able to work, did you obtain employment in Fort Worth or not?" Appellant's counsel objected to same and the court overruled said objection and permitted the witness to answer. This bill is approved with the same qualification as set forth in Bill No. 4. Certainly this qualification disposes of this bill.

Appellant objected to that paragraph of the court's charge wherein he told the jury that "seduction means an enticement of a woman on the part of a man to surrender her chastity by means of some art, influence, promise or deception calculated to accomplish that object and to include the yielding of her person to him as much as if it was expressly stated." Appellant insists that said definition is erroneous, since the same makes a deception, influence, art or promise sufficient to constitute the offense regardless of the character of the deception or promise, and because under the laws of Texas, the offense of seduction consists of a woman surrendering her virtue by reason of a promise of marriage. The charge is correct.

We have carefully read the various criticisms of appellant on the charge of the court in this case and desire to say, that the same is a proper and an entirely correct presentation of the law.

The only question we deem necessary to consider at any length is the sufficiency of the evidence. Prosecutrix and appellant became engaged to marry in the month of October, 1903, which engagement continued until the following August. At that time appellant and prosecutrix had a misunderstanding and the engagement was broken off. But the same was admissible in evidence, and the court did not have to limit its effect in his charge to the jury. Appellant did not visit prosecutrix for about six weeks. The day after the engagement was broken, prosecutrix wrote appellant a letter that they could be friends, if not lovers, and after receipt of said letter appellant waited about six weeks and renewed his attentions to prosecutrix. Appellant requested presecutrix to let him come back and be friends. "He said he could not marry me. I told him I did not know. He said, I will give you a while to study about it; and I sat down and wrote him he could come back and we would be as friends again." Prosecutrix testified they became engaged again, and appellant said that he was not financially able to marry that winter, but that they could marry next spring." This conversation occurred in October, 1904. Appellant and prosecutrix went in a buggy to church, and on the way back, prosecutrix says, that defendant begged and importuned her to yield to his embraces by virtue of her love for and engagement to him; that it would not hurt her, and he would see that she was not harmed by the illicit intercourse. Thereafter prosecutrix became pregnant and informed the appellant thereof as soon as she found it out herself, which was about six or seven weeks after the illicit intercourse; that she only yielded to his entreaties by virtue of her love and the promise of marriage; that she refused many entreaties and importunities before yielding to his embraces. After this prosecution was instituted, appellant went to where the prosecutrix was, and made this statement to her: "He just said that he knew it was his child, but he did not feel like he ought to marry me, and he said that was the only way to settle the case, and asked me if I wanted to see him go to the penitentiary, and I told him if he would do what was right I didn't; that he knew that was where he ought to be." The fact of appellant going to see prosecutrix was amply corroborated by other witnesses in this record. The appellant ran away before the institution of this prosecution, a short while before the birth of the child and confessed to a witness, by the name of Girard, that he claimed prosecutrix as his girl and that prosecutrix was "knocked up," and that he would have to leave—the only inference being that he was the author of her shame. Appellant admits the engagement to marry; admits that it was broken off according to the date stated above; admits his subsequent renewal of his visits and said there was no entreaty made, no suggestion of marriage, no asseverance of love, but that without a word prosecutrix yielded to his embraces on the fatal November night stated by the prosecutrix. Now, in

this case, we have the prosecutrix swearing to an infamous case of seduction. We have the appellant admitting an engagement lasting from October to August; we have the renewal of his visits within six weeks thereafter; we have him admitting the carnal intercourse at which time the seduction, according to the State's case, took place, but claiming there had been no promise of marriage at that time since the engagement had been broken off, but does not the engagement strongly corroborate the probable truth of the prosecutrix' statement that said engagement was subsequently renewed? We say it does. We have the flight of appellant; we have the clandestine visits to prosecutrix after the institution of the prosecution trying to find out what she is going to swear, we have him nowhere in an attitude showing innocence of purpose or nobility of intent. During the progress of the trial in this case, appellant introduced a letter written by the prosecutrix to him which contained statements showing indelicacy and immodesty on the part of prosecutrix, if the same does not show a vulgar mind, which would be evidence of a lack, to that extent at least of chastity; but the record before us does not indicate that degree of refinement that will enable us to say that such grossness as the letter manifests, was not altogether in consonance with chastity. At any rate, whatever view of the same may be taken along the line above suggested, the best that appellant could claim would be the circumstances to indicate a lack of chastity, and it would not go to refute the idea that prosecutrix's testimony was corroborated at all but would go to the original question as to whether the carnal intercourse was had with a chaste woman. The jury have settled the question against appellant on this issue and the question that we have now before us for consideration is, whether there is sufficient corroboration. Furthermore, this letter introduced was written to appellant long before the first engagement was broken off showing that he, himself, did not think it evinced any lack of chastity on her part but he, evidently, took same as an evidence of the boundless love and familiarity, and continued the engagement for months after this questionable letter was written. Appellant also introduced a letter, as stated above, written by prosecutrix just on the eve of her leaving home under the cruel demand of her father, which appears to be an incoherent rehearsal of the circumstances leading to her downfall. Some of the statements are at variance with her statements on the trial in this case, which statements we do not deem necessary here to collate in detail. At the time the letter was written, the facts show that the prosecutrix was laboring under great mental anguish; that a short while before she had given birth to a child. and the whole circumstance under which it was written show a herculean effort on her part to parry the wrath of her cruel father and to lessen the resentment that he felt towards her. The jury evidently took this view of the matter and we think they were amply warranted in so doing. Furthermore, the prosecutrix on the stand admitted the letter, stated the contents thereof was not true and stated the circumstances under which it was written.

Appellant further insists that no witness testifies to the last engagement, except the prosecutrix, and she testifies that as far as she knew, no one was apprised of the renewal of the old engagement except herself and the appellant. In answer to this contention we say that the record does not indicate that any one except appellant and prosecutrix knew of the engagement that had been previously broken off, which engagement lasted for nearly a year, but the circumstances in this case show conclusively that degree of association that leads irresistibly to the conclusion that the woman, when she swears that the engagement was renewed, that her testimony is true and corroborates her statement that there was a renewal of said engagement. Furthermore, the record before us shows that up to the time of her debauch, prosecutrix had borne a blameless reputation for integrity and virtue in the neighborhood where she had lived for a number of years; that she had never gone or kept the company of any other young man except appellant and that no brand of suspicion had ever been attached to her name. Furthermore, the jury may have, and were amply warranted in doing so, believed that appellant when he testified to the platonic manner in which he had intercourse with prosecutrix was willfully lying since he says no species of blandishment; no asseveration of regard; no entreaty; no reluctance and no suggestion of the awful outrage that he was about to perpetrate upon the prosecutrix, was ever made prior to the time he did perpetrate same and that she yielded without a word, and he uttered not a word, except the blunt and commercial proposition to have intercourse with prosecutrix which she assented to.

If the evidence in this case does not sustain a conviction for seduction, then there is no one case in a hundred seduction cases that could be made out under the law of corroborating an accomplice. Ninety per cent of the engagements of young people never take place in a public way; the marital contract is not made with the coarse publicity of the purchase of a mule, or the flippant notoriety, or flippant publicity of purchasing a pocket knife. Forlorn looks of love do not prosper in the light of publicity, nor are they seldom ever indulged in. So we take it, that this record is replete with evidence clinching the conclusion, and leading beyond peradventure to the opinion that the evidence excludes every other reasonable doubt than that the testimony is corroborated, and makes not only that degree of corroboration necessary by law, but practically proves the seduction out of the lips of appellant himself. There is no limit that could be justly put upon the amount of punishment that the seducer should receive and the appellant in this case, though he received seven years, should be congratulated that he did not get more.

We hold that the evidence amply supports the verdict and the judgment is affirmed.

*Affirmed.*

[Rehearing denied.—Reporter.]

DAVIDSON, PRESIDING JUDGE (dissenting).—Appellant was convicted for seduction, his punishment being assessed at seven years confinement in the penitentiary.

The facts may be stated as follows: Appellant and Miss Florence Rodden became engaged to be married, which engagement lasted for some months, and was broken off at the instigation of appellant. This may be taken as an admitted or conceded fact as both appellant and Miss Rodden so testify. It may also be stated as an admitted or conceded fact that the engagement was broken off in August. Shortly after the cessation of the engagement, Miss Rodden wrote appellant a letter, which he received, asking him to continue his visits. Appellant paid no attention to the letter or the request for something like five or six weeks, when, Miss Rodden testifies, about the 26th of September he again called. She testifies further that they became re-engaged in October, and that the night of the 6th of November they had carnal intercourse under a promise of marriage on the part of appellant. She says at the time the engagement of marriage was broken up, he told her that he thought more of her than any other girl but could not marry her, giving no reasons for not doing so, except that he was not able to marry; that she was not certain when this statement was made, whether before or after the engagement was broken off. Subsequently, appellant told her he did not care enough for her to marry her; she says the next morning after this statement from him she wrote him a letter asking him to come back and be her friend; that up to this time he had never said or done anything that led her to believe he would ever try to take any advantage of her, nor did he ever do anything ungentlemanly in her presence. Among other things contained in the letter written by her to appellant, she says, "I don't ever hear of anything these days but some one being sick. I never heard of the like. I had a light case of la grippe myself, but was my own doctor and nobody knew I was sick. Willie complains all the time. I don't wonder [at] that, though; if I looked like she does, I would crawl in a hole and pull the hole in after me. Hope being close to a man won't ever cause me to look like she does. You had better look out; I think I can catch Bearch W., for he smiled at me last Sunday, and talked to me too. Don't you think he carried an old hen to church. * * * Verna and W. have been writing for me to come and stay awhile with them, and I did think that I would go until V. wrote and said that she had a whole lot to tell me that you had said about me, and I have decided not to go, for I do not want to hear what she has to tell me. I know you are a bad boy, but I say, give the devil his dues, for he is bad at his best. The landlady at the Rodden residence has been very busy making baby clothes. She is making plenty of them. Verna said for me to come over and help her make them, but I am not ready to do such sewing as that. Willie told me the other day to take her advice and never marry, for men were dangerous things. I don't doubt that, but I ain't going to marry until I get a chance, for I have always heard it was $50 fine to marry without a chance. I guess you think I am crazy

to marry, for I think I about half-way made you believe that any way. Of course, I will the first chance, but I don't want to half as bad as I talked like I did." Willie to whom presecutrix referred was prosecutrix' step-mother. While upon the stand she was asked to explain what she meant by this part of her letter, but she declined to do so.

Carnal intercourse occurred on the night of the 6th of November. The child was born on July 8, 1905, about 242 days after the act of intercourse should have occurred. She testified further that no one ever had carnal intercourse with her up to the night of November 6th. It occurred in a buggy, as they were driving along the road; that they did not stop the horse; no one was driving. She says she got in a family way that night; that the act did not give her much pain; sickness was on her at the time, and it was not much trouble to cause penetration. Subsequent to her intercourse with appellant she made a written statement, all of which is unnecessary here to recapitulate. She, among other things, states, that she was never sick like other women, which made her think nothing was wrong. "One, eve we went to Leona and then to Henson's, and was aiming to go home before night, for Marvin had promised to go to Vashti that night, and Ruth and Walter Thompson begged us to go to church that night, until we give up to go, and that was when the awful deed was done. He proposed, and, of course, I refused. Told him that was the wrong time any way, and that was the last thing I ever intended doing. It was as mean as hell itself. I preached to him about it; he tried to get me not to talk so loud, but I was mad; don't know who heard me; he then seen I was not going to give up to such. He said he knew there was not anything the matter with me, and he couldn't hurt me, but I never give up, and just when he done it I couldn't tell if I was going to be hung. We quit, and I never spoke to him for a month, and Mollie tried to get me to go home with her; said I would have a way to get home, and I knew or thought I knew that Marvin had her to do that. I never went, and when I come home he come. I told him I did not think he would ever come back, and he said I ought to know he would, and that he wouldn't ask me if he could come; and we made up, and when I seen that something was wrong, I told him that something was wrong somewhere. I did not know anything had been done to hurt me, and he said that he knew nothing had been done, and time went on and he said that he would get me some medicine if I wanted it." During her examination on the witness stand she stated that "he asked me that and when I refused him then he said that I knew he would marry me if he hurt me in any way," and that was what she testified to a year ago, but on the examination she stated that statement was not a fact. On her examination this occurred: "Q. Who did you tell of your engagement? A. No one at all. Q. Didn't anybody know it so far as you know? A. No one at all. Q. Didn't nobody know that he had proposed to marry you or that you had consented? A. No, sir; there was no one that ever heard him say anything about marrying me. Q. So far as you know there was no one that knew

anything to the effect that he had proposed marriage to you, and that you had acceded to his proposal? A. No, sir." She also testified that before the act of intercourse, she would sit in defendant's lap, without his having pulled her in his lap. This perhaps may be a sufficient statement.

There are several errors assigned upon the charge as given, and refusal to give requested instructions, and to the ruling of the court admitting testimony, as well as insufficiency of the evidence. I have carefully read this record to ascertain if there are facts corroborating the prosecutrix' evidence as to the seduction. In order to prove this offense under our statute, it is necessary that the girl's mind be led away by arts, wiles and blandishments from the path of purity, and then the act of intercourse be followed under the promise of marriage. It is not sufficient that the mind be debauched; the body may also be debauched under the promise of marriage. The seducing of the girl's mind and the final act of intercourse by reason of the promise of marriage must occur to constitute this offense under our statute. It is further necessary, inasmuch as the seduced female is an accomplice when testifying, that she be corroborated as to the agreement or contract of marriage. Without going into the facts in regard to any other phase of the case than that of promise of marriage, we fail to find any corroboration as to that fact. It is true that they had been engaged up to August, 1904, when it was broken off. She says that this engagement was renewed perhaps in October following, and that the act of intercourse occurred one night on their return from church at Leona, and under circumstances sufficiently detailed in the statement of evidence, supra. She testified clearly that that no one knew of the engagement; that she never mentioned it, and the evidence fails to show any corroboration of her statement as to the second engagement. Of course, the act of intercourse could not have occurred in pursuance of the first engagement, because all the testimony shows that had ceased some months before she should have surrendered her virtue. Appellant denied emphatically the second engagement, and there the matter stands so far as the record is concerned, except her written denial of knowledge of the act of intercourse and what then occurred. There is some evidence, however, to the effect that he went with her occasionally, but these visits, as far as the evidence is concerned, are mainly confined to the existence of the prior engagement. There is one fact perhaps that might be stated of a criminating nature, to wit: appellant's flight. This, however, seems to be attributed to his fear of vengeance on the part of the father and uncle of the girl, and more especially that of the uncle. This does not prove, nor legally tend to prove an engagement to marry. He admits having had carnal intercourse with her, but had told her all along that he could not marry her, assigning reasons. I do not believe, therefore, that under the statute and decisions of this State that the girl's testimony in regard to promise of marriage is corroborated. The fact that she had a child would not corroborate her as to the promise of marriage. It is a powerful circum-

stance to show that she had intercourse either with appellant or some other man. In fact, following the law of nature, in regard to reproduction, I take it, as a conclusive fact, that she had had intercourse with some man. We only try violations of law under the statute denouncing the offense, not for immorality. I am of opinion, therefore, that the evidence is not sufficient. Rape, fornication, adultery and incest are morally wrong, and often shocking to humanity, but they do not prove seduction, nor show contract of marriage, nor tend to do so.

This requested instruction was refused: "You are instructed that you cannot consider the testimony as to the engagement, or any promise to marry made by defendant to the prosecutrix at any time prior to August, 1904, and you can only consider a promise to marry made by the defendant to the prosecutrix after the month of August, 1904; if you find that the defendant made any promise, and before the act of carnal intercourse, and unless you so find you will acquit the defendant." I think this charge should have been given. The contract or the promise of marriage in existence prior to August, 1904, had been cancelled and was no longer in existence, and the jury should have been told that the seduction could not have occurred by reason of that promise of marriage, if one existed. The court had charged the jury that if they should find from the evidence that appellant at any time within three years next prior to May 2, 1906, had seduced Florence Rodden by promise of marriage, etc., they should find him guilty. The promise of marriage had been broken off in August, 1904, within two years of the 2nd of May, 1906. Under this charge of the court, the jury could have convicted him under the prior but dissolved contract of marriage. The court further charges the jury that they must acquit, unless they believe from the testimony, etc., that defendant had carnal relations with Florence Rodden in Clay County, within three years next prior to May 2, 1906, and that she relied on such promise of marriage made to her prior thereto by the defendant.

For the errors indicated, this judgment ought to be reversed and remanded. I therefore respectfully enter my dissent.