## Bert Bost v. The State.

### No. 1070.   Decided January 10, 1912.

### Rehearing denied February 28, 1912.

**1.—Seduction—Evidence—Bill of Exceptions.**

Where no bills of exception are reserved to the introduction of testimony, the same can not be considered on appeal.

**2.—Same—Continuance—Discretion of Court.**

Where it was very improbable that the alleged absent witness would have testified as alleged in the application for continuance, and the same was addressed to the sound discretion of the court, there was no error in overruling same; besides, there was no diligence.

**3.—Same—Argument of Counsel—Defendant's Failure to Testify.**

Where, upon trial of seduction, there was evidence that prosecutrix wrote three letters to defendant, one of which was introduced in evidence, the argument of State's counsel to the effect that defendant had failed to produce the other two letters, etc., was not a comment on the failure of defendant to give evidence against himself; besides, the bill of exceptions was defective.

**4.—Same—Charge of Court—Article 723.**

Where, upon trial of seduction, the court, in his charge, sufficiently and correctly applied the law to the facts, and the defendant asked no special instructions, there was no reversible error under article 723, Code Criminal Procedure, although there may have been some omissions in some particulars in the charge of the court.

**5.—Same—Charge of Court—Time of Offense.**

Where, upon trial of seduction, the court charged the jury that if they believed from the evidence, etc., that defendant, at any time within three years next prior to the date of filing the indictment, seduced the prosecutrix, etc., to find him guilty, the indictment charging defendant on or about a certain date of the year in which the indictment was filed, there was no reversible error.

**6.—Same—Charge of Court—Definition of Seduction.**

Where, upon trial of seduction, the court's charge properly defined the word "seduced" according to the precedents of this court, there was no error. Following Faulkner v. State, 53 Texas Crim. Rep., 258, and other cases.

**7.—Same—Corroboration—Sufficiency of the Evidence.**

Where, upon trial of seduction, the evidence sufficiently corroborated the testimony of the prosecutrix, the conviction is sustained, and there was no error. See opinion for facts which sufficiently corroborate the testimony of prosecutrix.

Appeal from the District Court of Clay. Tried below before the Hon. P. M. Stine, Special Judge.

Appeal from a conviction of seduction; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Chandler & Pannell* and *H. A. Allen & W. T. Allen,* for appellant.—On question of refusing continuance: Curtis v. State, 40 S. W. Rep., 265; Mitchell v. State, 36 S. W. Rep., 456; McAdams v. State, 24 Texas Crim. App., 86; Pearson v. State, 56 Texas Crim. Rep., 607; Jones v. State, 55 Texas Crim. Rep., 123; Johnson v. State, 55 Texas Crim. Rep., 134.

On question of State's counsel argument to defendant's failure to testify: Jordon v. State, 29 Texas Crim. App., 595; Hunt v. State, 28 Texas Crim. App., 149; Shaw v. State, 57 Texas Crim. Rep., 474; Brown v. State, id., 269; Davis v. State, 54 Texas Crim. Rep., 236; Harville v. State, id., 426.

On question of the court's charge on date of offense: Lemmons v. State, 58 Texas Crim. Rep., 269; Campbell v. State, 57 Texas Crim. Rep., 301.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—On October 28, 1910, the grand jury of Clay County indicted the appellant for seduction, charging that on or about January 10, 1910, the appellant did unlawfully seduce Alma Whitaker, an unmarried woman, under the age of twenty-five years, and obtain carnal knowledge of her by means and in virtue of a promise of marriage to her previously made by him. The appellant was tried November 9, 1910, found guilty and his punishment fixed at three years imprisonment in the penitentiary.

Besides an able oral argument, when the cause was submitted, the appellant's attorneys have filed a clear brief in the case. In his motion for new trial several complaints are made about the introduction of testimony and some proceedings on the trial. It is necessary, under our practice, to present these questions by bills of exception, and unless so presented this court can not consider them. We will consider and pass upon such questions as. are properly raised in the case. In order to present them properly we will state the evidence in substance that was introduced on the trial.

Only three witnesses were introduced on the trial, all by the State. One of these was Alma Whitaker, the party charged to have been seduced, and the others were two young men, Joe Patrick and Al Buchanan. In addition to these witnesses the State introduced a postcard claimed to have been written and sent by appellant to Alma Whitaker in July, 1909. The only evidence the appellant introduced was a letter from Alma Whitaker to him, written about April, 1909.

There are twelve typewritten pages of the direct testimony of Alma

Whitaker. It seems that every detail of her movements and her conduct with the appellant and others for a period of probably two years, were minutely detailed. There are eleven pages of cross-examination, going over the same matters largely, but in addition thereto, drawing out additional details. Then nearly five pages of redirect examination of her. We deem it altogether unnecessary to give in detail her testimony.

Her testimony shows that she was twenty years old when she testified, had never been married and had all the time lived with her parents. The appellant was about her age, perhaps one year older. He lived with his parents also. Alma Whitaker first met appellant and became acquainted with him in November, 1908. During the early spring of 1909, or at least shortly after, or about January, 1909, the appellant and his parents moved from Erath County to Clay County, Texas, on a farm. Alma Whitaker's parents, for the years 1909 and 1910, rented land from appellant's parents, and they lived about a half mile apart. While Alma Whitaker and appellant became acquainted in November, 1908, and knew one another continuously thereafter, the appellant did not begin to wait upon her specially until about April, 1909. He then began going to see her at her home and met her at Sunday-School and church practically from Sunday to Sunday thereafter. He also began at that time to escort her to and from various parties and singing exercises held at different places in the community and Sunday-School and church and to take her riding in a buggy to various places, and to picnics. Early after he began his attentions to her he began making love to her. Early in July, 1909, they were engaged to be married. It seems that some time in July they had some little misunderstanding in what might be termed a lover's quarrel, caused it seems by his jealousy of her and the fact that about that time she had accepted the company of another young man who went with her to some gathering. This difference, however, was soon made up between them.

In July, 1909, the appellant went back from Clay to Erath County either on business or pleasure, or both, where he remained until some time early in August. While there he sent her a picture postcard. This original postcard was sent up for the inspection of this court by the trial judge as a part of the statement of facts. The card is just such picture postcard as is commonly in use and has been for a long time in this country. On the face of it, on the right-hand end, just under this in print, "this side for the address only," it is addressed "Miss Alma Whitaker, Petrolia, Tex." On the other end under this in print, "this space may be used for writing" this is written: "Hello kid, how are you—I am living high—I haven't went with a girl since Ive been here. I going some ant I. So bye bye. Bert." And on the face of it is the clear postmark used by the postmaster canceling the one cent stamp showing the office where mailed. This postmark is "Dublin, Texas, July 31, 3-PM,

1909." On the other side of the postcard is the picture of a large diamond ring. Standing within the ring is a young man clasping in his embrace a young lady and kissing her. To the back of this scene are flowers, a road, the green grass and the picture of a nice residence. Around the margin and on the ring is written: "Say kid how does that look to you?. It looks good to me, don't it to you?" Around the outer edge of this side of the postcard this is written: "Well kid, I will be back the last of next week if business don't pick up and I don't think it is—the way things look." Then underneath the picture of the girl and young man above stated is this verse of poetry:

"Near your home where as children oft we've strayed,
   Plucking flowers all wet with dew;
I've won you, and kissed you, my pretty maid,
   And this Ring shall whisper, he's ever true."

Alma Whitaker further testified that about the first week in August upon appellant's return from Erath County she saw him and that he then told her he had written and sent to her the said postcard. His attentions to her continued thereafter—particularly from Sunday to Sunday, he meeting her and taking her to singings, preaching, parties and other things in their neighborhood. From time to time while they were together they were discussing their future arrangements and engagement to marry, it being understood between them that they would marry that fall—the fall of 1909—if her parents were to move away from that community at the end of that year, but if her parents were not to move away they would defer their marriage until the fall of the next year, 1910. Up to November, 1909, the appellant had never made any indecent proposal to her or sought to have sexual intercourse with her. But about the middle of November when he was taking her in his buggy from her home to a big gas well at Petrolia, a few miles from her home, he then tried to get her to submit to him and let him have sexual intercourse with her. She refused and told him that he was mistaken in the girl he was talking to if he thought she would do anything like that. He replied, "Well, there wasn't any harm; we are going to be married." She told him no, that she would not have anything more to do with him and would not go with him any more. The next time he saw her was at Sunday-School, the last of November or first of December. He then apologized to her and wanted to make up, but she declined, telling him he had not treated her like a lady. The next time she saw him was also at Sunday-School just before Christmas. He again wanted to make up with her and wanted her to let him come back, but she again refused to do so. However, on the first Sunday in January, 1910, being January 2, he saw her again and at that time she did make up with him and they then renewed their engagement to be married. This meeting was at a singing at one of the neighbors. Up to that time she had never had

carnal intercourse with anyone. When they made up on this occasion he promised her that he would never again say anything to her out of the way. He then accompanied her home that night and then made arrangements with her to take her driving the next Sunday, January 9. On that evening he came to her home in his buggy for .her, first took her to Sunday-School, then to church at another place, and they again on this occasion talked over their engagement or when they were to marry practically to the same effect as at first, that is, as her parents were going to live on his father's place again for the year 1910 they would marry that fall. On this occasion when he was taking her from church home, a distance of several miles, he again desired her and proposed for her to have sexual intercourse with him. She said to him, "I thought you promised me that you would not say. anything like that again." He said, "Well, you know there wasn't any harm in it; we are going to be married." "I asked him if he had a sister in my place and some fellow was to say what he had, what would he do? And would he think it was all . right? He said it was all right if she loved the man and was going to marry him; that he would think that it was all right." And thereupon he had sexual intercourse with her three times that night on their return from church. She had never before then had sexual intercourse with any man. She submitted to him because he promised that he would marry her. If he had not promised to marry her she would not have had carnal intercourse with. him that night. She believed that he intended to marry her. After this first act of intercourse they again discussed their engagement to marry when he desired again that night—soon after the first act—to have intercourse with her. She objected, but he said, "No, you have yielded once; we are going to marry," and that it was all right; that the engagement would be short and she then again submitted to him. Between each time of intercourse that night they discussed the fact that they were going to marry and she relied upon his promise of marriage. The appellant never afterwards had intercourse with her and no one else since then had had intercourse with her.

A child was born to her on September 25, 1910. She had the child with her on the stand when she testified, and testified that the appellant was the father of it. After the intercourse with Alma Whitaker stated above appellant saw her from time to time at Sunday-School and other places, though he began to neglect his attentions · to her and soon thereafter ceased all attention to her. On these occasions, when he met her, however, at church and other places, he asked her in effect what her condition was, trying to find out whether she was pregnant. At first she told him she did not know and she could not tell. A month or two later, upon his inquiry again, she told him that she was in a family way by him and they talked over this matter several times between them. Soon after he found out her condition he told her he would keep his promise and

marry her and nobody would ever know of her then pregnant condition. On one of these occasions she told him she could not keep the matter a secret much longer, and he then said that he would go with her to Henrietta and get married the next Sunday. She had been trying to keep her condition a secret and concealed from her folks, believing all that time that he would keep his promise and marry her. Instead of keeping his promise and marrying her, he ceased going with her altogether and left that community and she never saw him thereafter for five or six months. While he was gone he married another woman.

This is the substance and material part of her testimony on direct examination.

On cross-examination much of the particulars of the various matters she had testified to on direct examination were gone over again. There were some conflicts in her testimony shown by the statement of facts, but no more so than there would be of any other witness examined, cross-examined and reexamined as she was, as shown by the statement of facts.

On cross-examination is was shown by her that from time to time a few times from April, 1909, until in January, 1910, they had had some crosses which might be termed lovers' quarrels, but not of much moment. One of these occurred just before he went to Erath County in July, 1909. As she expressed it, "I do not reckon they amounted to much. We made up just about as quick as we fell out." The occasion was that the appellant was jealous of her, because she had talked to another boy, John or Joe Patrick, and with whom she had gone to some place after appellant began his devoted attentions to her in April, 1909. In one of their little differences, as early as in April, 1909, she wrote him a letter. She stated that in addition to this letter she had written him two others during their whole engagement. What the others are were not disclosed. Appellant produced and introduced in evidence—which was identified by her—the letter she wrote him about April, 1909. It is as follows:

"Dearest.

"I told you I was going to write you a letter. You wouldnt talk to me tonight, why wont you tell me what I have done? I havn't any Idea at all what it is. Please give me a chance. I wouldnt do anything to make you mad at me if I knew it. Say Dearest wont you tell me wont you talk with me one more time? I dont think you will Refuse me that much will you? I want to aks you to come Back, but dont know what you will say. Wont you come again next Sunday eve, that is if you can indure my company that long. You know I would do anything for you. Wont you give me one more chance? I want to talk with you so bad you dont know how I feel now after you wouldnt talk to me tonight. Dear wont you do as I want you to this time, and tell me what I have done or have you

Just got tired and quit? Now please let me have one more talk with you. I want to know whether you are mad at me or Just tired of me. But Dearest I will always love you, nothing can keep me from it. I am so cold I cant write. Well Dearest I will quit, I dont know what you will think, but Dear I cant help loving you, and I want you to come back if you will. Well Dear I leave it to you.

I am always your friend Alma."

She also admitted on cross-examination that John Patrick went with her on one occasion, but she shows that nothing improper could have occurred between them on this occasion. There was no intimation that anything had occurred. The bare fact that she went with him was drawn out by appellant. Appellant also brought out on cross-examination that she, about August, 1909, became acquainted with one George Nelson, but she shows by her testimony clearly that the appellant himself introduced George Nelson to her at some picnic, and that she was nowhere alone with him on that or any other occasion, and that while she saw him on one or two other occasions she had no conversation with him. It was at some public gathering of young folks, where there was a mixed company and a large crowd all the time when she saw him, and appellant was also one of the company. It was also drawn out on cross-examination by appellant that she, at one time, while they were engaged went with John or Joe Patrick, but she showed by her testimony that they were accompanied in just such way by others as that no opportunity could have occurred for anything improper, for on this as in every other instance where she is shown to have accepted the company of any other young man, the explanations are always made by showing that nothing improper could have occurred. Besides, none of the testimony indicates that there was any suspicions aroused by her conduct with anyone else—simply and solely the fact that someone else had accompanied her on some rare occasion. Another person she had gone with in the same way was Buchanan, one of the State's witnesses, but the same state of facts was shown to exist about him as with the others and in addition he, himself, explained how he came to go with her on that occasion which was in effect that she, her cousin, and Miss White were together and John Patrick wanted to go with Miss White, whom he soon afterwards married, and in order that they might be alone he got Buchanan to go with Miss Alma Whitaker, they all going along closely together.

Her testimony, so far as the appellant's friend, George Nelson, was concerned, not only excluded, but made it impossible for him to have had any private conversation with her, much less any opportunity of sexual intercourse. Her acquaintance with Nelson, as stated above, was brought about by the appellant himself, who intro-

duced Nelson to her. Nelson worked around in the community only a very short time, perhaps about a month.

In her direct, cross and redirect examination, it is shown that the appellant was frequently with her alone at night, unaccompanied by anyone else; that he usually took her back and forth to picnics, singings, church, Sunday-School, and drove to and from other places with her in the buggy with him and that they were frequently out in this way at night. In fact, her testimony is full and clear as to when and where he was with her and shows that he and he alone had ample opportunity to have had sexual intercourse with her as she testified.

Joe Patrick, who was introduced by the State, among other things, on direct examination, testified: That he had known appellant and Miss Whitaker both about two years; that he was twenty-two years old. "I remember of having a conversation with Bert Bost in which he stated something about Miss Alma Whitaker and their conduct and what he wanted to do with her. I had a conversation with him in 1910. I had that conversation with him when he and I went to Wichita Falls—as well as I remember it was the 24th day of July, 1909. At that time he told me that he was having a good time with Alma Whitaker." That appellant gave him to understand that he was then having intercourse with her; that in the latter part of the spring of 1910 he had another conversation with appellant about her in which the appellant told him that he thought others had done what he had to Miss Alma Whitaker, and if they would say that they had he would give them $25; that if he could find someone who had had intercourse with her and would say that they had, he would give them $25. That the appellant was married in the spring of 1910 when he told him that. On cross-examination he stated that he had been in Miss Whitaker's company a time or two; that many times he had seen her at Sunday-School and social gatherings and that he had gone with her a time or two himself, but did not remember when that was. He also, on cross-examination, stated that in the conversation about July 24, 1909, in which appellant told him that he was having a good time with Alma Whitaker and from which he understood that he was having carnal intercourse with her, appellant also told him that he and Miss Whitaker were not engaged to be married.

On redirect examination by the State it was shown that this witness had testified on an examining trial; that his testimony had been written down and signed and sworn to by him; that at the time he had made some changes and corrections in it. And on this redirect examination on the trial it was shown that he testified additional matters tending to be in favor of appellant that had not been testified to on the examining trial, and when asked what had refreshed his recollection he replied, "Well, a fellow can study about a few things," but denied that he had been studying anything that he could testify for appellant. His written testimony signed and

sworn to on the examining trial was introduced, in which it was shown that he testified that appellant went to Erath County in July, 1909; that Miss Whitaker and appellant had been going together two or three months about that time, and that it was in July, 1909, that he had this conversation with appellant, and he stated that he had been having a good time with Alma Whitaker; and that when appellant, in the spring of 1910, said to him he would give $25 to anyone who had done the same and would say so, that they were speaking of the condition of the girl, Alma Whitaker, then being so long gone.

This witness also testified on cross-examination on the trial that somewhere about Christmas, 1909, he had a conversation with Miss Alma Whitaker about appellant, and that in substance she told him she would like to know what was the matter with appellant and that she would like to have him come back, and that he (the witness) asked her if she and appellant were thinking about getting married and she replied no, there had not been anything said about it. This conversation occurred between her and the witness at Sunday-School. She denied having any such conversation or saying any such thing to the witness, or rather that she did not remember any such thing, but said in effect that she would not have disclosed to that witness the fact that she had been engaged to be married to the appellant even if it had been a fact.

The only other witness introduced was the said Buchanan, who testified in substance that he knew the appellant and Alma Whitaker and had known them about two years; that he did not know just when appellant began going with Miss Whitaker, but he went with her during the year 1909; that he would go with her two or three Sundays and drop off and then go again; that he had a conversation with appellant some time after he had quit going with her about his quitting. He could not fix the exact date of this, but it was in January or February, 1910; that he was talking to appellant about him and Alma Whitaker being split-up. Appellant said to him, "That is all right; if I go again you may know that I am having fun." On cross-examination he testified in effect that the reason appellant quit going with Alma Whitaker occasionally was because they would have what he called a split-up or a racket. That appellant first began going with her in the winter or spring of 1909; that he could not tell how long after that before they had a racket, but he knew of two or three rackets or split-ups they had. During the time appellant was going with her he (witness) took her from her home once to a singing at a neighbor's at night. On this occasion he stated she told him that she and appellant were at outs, and had had a falling out or split-up, and she was wanting to know what he was mad about and the witness told her he did not know. She said something to him about seeing appellant and talking to him about it; that if he would find out what appellant was mad about

she would do anything in her power for him. She testified she did not have, or did not remember having, such talk with the witness. He further testified that this was about Christmas of 1909, or it might have been the first of January, 1910. He did not see appellant as suggested by Miss Whitaker, because he thought it was none of his business. He then explained how it was he came to go with her on the one occasion and, as stated above, it was that John Patrick was waiting on Miss Alma Whitaker's cousin, Miss White, and that they were together and Patrick got him to take Miss Whitaker on this occasion so that he, Patrick, could take Miss White, whom he soon afterward married.

Appellant's first complaint is that the court below erred in overruling his application for a continuance for the witness George Nelson, mentioned above. The application shows that Nelson's residence was in Young County, but he was absent from home at that time and his whereabouts unknown to appellant. The record shows the examining trial of appellant was had on October 15, 1910; that he was indicted on October 28, 1910, and on October 31, 1910, he claims to have had a subpoena issued for Nelson to Young County, which was sent to the sheriff of said county and returned three days later with the information that said witness was not in Young County, but probably in Cooke County; that at the time the subpoena was issued to Young County he was informed the witness' mother's residence was in Potter County, and he procured at the same time a subpoena to be issued to Potter County for him, which was returned that he could not be found. That about November 2d or 3d after the subpoena from Young County was returned, he sent another to the sheriff of Cooke County. That about November 4, upon receiving information that the witness was probably in Erath County, he had a subpoena issued to that county which was returned about November 5 showing that the sheriff was unable to find the witness; "that each and all of said subpoenas are hereto attached and made a part of this application and marked Exhibits A, B, C and D, respectively." These exhibits show, Exhibit A, a subpoena issued October 31 to Potter County for the witness; another, Exhibit B, to Cooke County on October 31; Exhibit C shows another to Cooke County on the same day. Exhibit B without any return on it and Exhibit C returned November 3 that the witness was not found in Cooke County. There is no Exhibit D of any subpoena and neither is there any exhibit showing any subpoena to Erath County. Hence, the application for continuance was correctly overruled, because no diligence is shown to procure the witness. The exhibits show that no subpoena was issued to Young County where it was alleged he resided and none is shown to have been issued to Erath County where it is stated the appellant was informed the witness was. Besides this, granting a continuance on the application was addressed to the sound discretion of the court, and it is very improbable that the

witness would have testified any such thing as is claimed in appellant's application, that is, that he (the absent witness) had had sexual intercourse with Alma Whitaker in August or September, 1909, and that the said witness accompanied Alma Whitaker to Byers, in Clay County, Texas, on that occasion, a distance of six miles, to a picnic and public gathering, which was had the same time in the town of Byers. If the witness had so accompanied Miss Whitaker on the occasion named, doubtless there were many witnesses who attended the same picnic by whom such proof could have been made. Miss Whitaker herself testified positively that she did not accompany him on this occasion or any other and was never with him alone anywhere or on any occasion.

Another complaint by appellant is to the argument of Mr. Taylor, the attorney employed to assist the State in the prosecution. The record shows that about April, 1909, Alma Whitaker wrote to appellant the letter copied above in giving the testimony, and that she had written two other letters to appellant—one in July, 1909, and the other in January, 1910—and that she afterwards saw the appellant and he admitted to her that he received said letters. The appellant himself produced and introduced in evidence the letter copied above, but did not offer either of the other two letters. The argument objected to by Mr. Taylor was to the effect that the evidence showed that Miss Whitaker wrote the defendant three letters, which he admitted to her that he received, but he did not produce them before the jury, and that the jury did not know the contents of any except the one offered. Whereupon, the bill says, appellant's attorneys at once objected to said remarks and argument, because the same was commenting on the failure of the defendant to give evidence against himself; whereupon Mr. Taylor turned from the jury to the court and said: "Your Honor, I know I have the right to make this argument." To this remark of the counsel appellant also objected and the court refused to sustain either of said objections, and permitted said attorney to proceed with his argument upon the fact that the defendant had failed to produce said letters before the jury in evidence, and then counsel turned to the jury and in a loud and vehement voice said: "Gentlemen, this defendant has ruined the character and blasted the life of this poor girl, and caused her to be the mother of a bastard child, and has caused her and that child to live a life of shame and disgrace. I am not commenting on the contents of these letters, for they are not in evidence and we do not know their contents, but it is fair to assume they are in favor of the proxecutrix, and yet he comes into this court and asks the jury to turn him loose." To which action of the court in overruling said objections and the action of counsel in making said argument the defendant duly excepted.

It will be seen by the above bill that the only objection was to the first of the attorneys' argument above stated, and that the only ob-

jections thereto were that he was commenting upon the failure of the defendant to give evidence against himself. No ground of objection was made or stated· to the subsequent remarks of Mr. Taylor, quoted above.

It is our opinion that the argument by Mr. Taylor, the attorney for the State, was based upon and in strict accordance with proper argument on the evidence that was introduced and failed to be introduced. Judge Brooks, for this court, in Battles v. State, 53 Texas Crim. Rep., 208, in discussing a complaint of the attorneys' argument along this same line, said: "Where a defendant is on trial for a crime, the absence of any testimony that is wilfully omitted on his part, forms a predicate for any legitimate deduction for or against appellant." Such argument, even in commenting upon the failure of the appellant to introduce his wife, has been repeatedly sustained by this court. Locklin v. State; 75 S. W., 305; Armstrong v. State, 34 Texas Crim. Rep., 248; Mercer v. State, 17 Texas Crim. App., 452; Hall v. State, 22 S. W. Rep., 141; Smith v. State, 65 S. W., 186; Richardson v. State, 44 Texas Crim. Rep., 211; Mc-Michael v. State, 49˙ Texas Crim. Rep., 422; Grammar v. State, 42 Texas Crim. Rep., 518; Harris v. State, 47 S. W. Rep., 643.

In addition to this, the record shows that the testimony about these letters which were written by Alma Whitaker to appellant was exclusively drawn out by appellant in cross-examination of Miss Whitaker, and while she hesitated about identifying the whole of the letter written in April, 1909, which appellant afterwards introduced in evidence, she claiming that the whole of the letter was not shown to her at first and that she thought that they had in showing her different pages of it, taken part of one letter and used it, in examining her, as a part of another; and it was upon her identification of the letter which was introduced in evidence that appellant introduced it. Clearly, under the circumstances and the law the State's attorney had the right to make the argument and deduction he sought to make, which was complained of in this case.

Appellant, in his motion for new trial, makes several complaints as to omissions in the charge of the court. He asked no special charge to correct any of these claimed omissions. In order to properly present it, it will be necessary to give in substance the whole, and in part, in full, the charge of the court.

The court first correctly stated what the indictment charged against the appellant and that he plead not guilty. He then gave the statutory definition of seduction, quoting in effect if not literally the statute. The charge then proceeds:

"The term 'seduce' (as that term is used in this charge) means an enticement of a woman on the part of a man to surrender her chastity by means of some art, influence, promise or deception calculated to accomplish that object and to include the yielding of her person to him as much as if it was expressly stated.

"If you find and believe from the evidence beyond a reasonable doubt that in Clay County, Texas, at any time within three years next prior to October 28, 1910, the defendant, Bert Bost, did seduce Alma Whitaker by a promise to marry her, and by means thereof, did have and obtain carnal knowledge of her, the said Alma Whitaker; and you further find that at said time the said Alma Whitaker was under the age of twenty-five years and was unmarried, you will find the defendant guilty as charged in the indictment and assess his punishment at confinement in the penitentiary not less than two nor more than ten years.

"A conviction in this case can not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense.

"If you find beyond a reasonable doubt the testimony of Alma Whitaker introduced in evidence before you, to be true, and that the said testimony shows beyond a reasonable doubt that defendant was guilty of the offense charged in the indictment, still, you must acquit the defendant unless you further believe that there was other testimony outside of the testimony of Alma Whitaker introduced in evidence before you tending to connect the defendant with the commission of the offense charged.

"You must acquit the defendant and find him not guilty unless you believe and find from the evidence beyond a reasonable doubt that the defendant had carnal knowledge with Alma Whitaker in Clay County, Texas, within three years next prior to October 28, 1910, and that said Alma Whitaker relied alone on a promise of marriage made to her prior thereto by the defendant.

"Unless you find and believe beyond a reasonable doubt that the defendant, Bert Bost, did seduce Alma Whitaker by a promise to marry her, and by means thereof did have and obtain carnal knowledge of her, and that defendant was under a promise to marry Alma Whitaker at the very time he had and obtained carnal knowledge of said Alma Whitaker (if you find he did have carnal knowledge of her) then you will acquit the defendant."

The balance of the court's charge is instructing the jury that their verdict must not be the result of lot or accident. Next he gives correctly the statutory presumption of innocence and the guilt of the appellant must be established beyond a reasonable doubt, etc. Then that they are the exclusive judges of the facts proven, the credibility of the witnesses and the weight to be given to the testimony. In the last subdivision, he correctly charges them that they can not consider the failure of the defendant to testify in his own behalf.

These are substantially appellant's complaints of the omissions in the court's charge: That he failed to instruct the jury that if appellant had carnal intercourse with Alma Whitaker prior to Jan-

uary 9 to acquit him; that he should have instructed in the third paragraph by adding "unless you should find the defendant not guilty under the subsequent instruction herein given you." That they must acquit the defendant even though they believed the testimony of Alma Whitaker to be true; that the jury ought to have been instructed not to consider the testimony as to any engagement or promise to marry by appellant made prior to January 2, 1910, and that they could only consider a promise made on the latter date, if any. That the charge should have told the jury they must accept as true all of the witness Joe Patrick's testimony, unless the State had shown the falsity of such parts as were favorable to appellant; that the court should have told the jury in plain language that Alma Whitaker was an accomplice; that the charge should have affirmatively told the jury that if they believed from the evidence or had a reasonable doubt that Alma Whitaker was not a virgin or chaste woman on January 9, 1909, they should acquit the appellant.

It is our opinion that the charge of the court quoted above sufficiently and correctly submitted everything that was proper and necessary to be submitted under the evidence and the law, and that none of appellant's criticisms, even if it should be conceded that there may have been some omissions in some particulars in the charge of the court, under article 723, Code Criminal Procedure, authorizes us to reverse this judgment. In our opinion the charge of the court correctly and aptly submits everything as favorable, if not more favorable, to the appellant than he was entitled to.

Another complaint by appellant of the charge of the court is to that part of paragraph 3, wherein he tells the jury if they believe from the evidence, etc., "at any time within three years next prior to October 28, 1910, the defendant, Bert Bost, did seduce Alma Whitaker," etc., to find him guilty. The complaint about this portion of the charge is that it should have been limited to what Alma Whitaker alleged occurred on and between January 2, 1910, and January 9, 1910. It is too well settled to need citation to the cases that such charges have uniformly been sustained by this court.

Another complaint is to the definition of the word "seduce" as given in paragraph 2 of the court's charge. The definition given by the court is substantially in accord with the decisions on that subject. Faulkner v. State, 53 Texas Crim. Rep., 258; Putman v. State, 29 Texas Crim. App., 454; Wisdom v. State, 45 Texas Crim. Rep., 215.

The only other complaint is that the testimony is insufficient to sustain the verdict and judgment, and in this connection appellant contends that the evidence of Alma Whitaker was not sufficiently corroborated in law to sustain the conviction.

Judge Willson for this court, in Lagrone v. State, 12 Texas Crim. App., 426, said: "The law presumes a female to be chaste until the contrary is proved." The law, so presuming and the jury -

being presumped to know the law, it can also act upon such presumption. Such being the case, the presumption is and was that Alma Whitaker was a chaste woman at the time appellant is shown to have had sexual intercourse with her. In the recent case of Nash v. State, 61 Texas Crim. Rep., 259, 134 S. W. Rep., 709, in the opinions of Judges Ramsey and McCord, which were approved by this court, the law with reference to the sufficiency of the evidence to corroborate the seduced female, is thoroughly and exhaustively laid down and discussed. In both of those opinions and in the many cases cited supporting and sustaining them, it is clearly shown that the seduced woman can be corroborated by circumstantial as well as direct testimony. Judge Ramsey said (p. 713): "In determining the sufficiency of the evidence on appeal, we must assume as true not only every fact distinctly proven, but those inferences and conclusions of fact which in fairness the jury could draw from facts directly and positively established. It can no longer be doubted that it is the law that both the act of intercourse and the promise of marriage can be established by circumstantial evidence. No lawyer can, as I conceive, give any reason why the law of circumstantial evidence should not apply in cases of seduction as well as in cases of murder or theft." Again, he, in discussing the sufficiency of the corroborating testimony says (p. 716): "Of course, in so applying the testimony we must have some reference to the nature of the case, the situation of the parties, their station in life, and the opportunities for securing testimony in corroboration of the prosecutrix. In so doing we should also have some regard to the character of the offense, the situation of the parties, and what we know, and what the jury and the trial court knew of human nature and the relation of the sexes. We should also remember that accomplices, like angels, differ not in glory, but in blame. In this case the prosecutrix is in law called an accomplice, and in a certain sense her testimony suffers the same legal disparagement as that of a burglar, a thief, or an assassin who has turned State's evidence, and the law requires that before a conviction can be had on her testimony, there must be evidence other than her own tending to connect appellant with the crime, and yet we know that many a woman who has fallen is as to other men, wholly virtuous, and that many women who have gone astray under such circumstances as this young girl did might, by evidences of deep contrition, thorough repentance, and other evidences of truthfulness, prove as convincing in her testimony as that of any witness whose hand was ever lifted in a courthouse. To the jury hearing this case, and to the court sitting on the bench as a just arbiter between the State and the defendant, this case was committed (subject only to the provision of law that there must be other evidence tending to connect appellant with the crime charged), and the weight to be given to her testimony was for them to determine. It may well be that her demeanor on the stand shadowed forth such

clear-eyed and · white-souled truthfulness as that they were so thoroughly convinced and so deeply impressed that to them her word, like Caesar's, 'might have stood against the world.' The weight to be given to her testimony was, of course, for the jury. The only limitation placed upon their action in regard to what credit they would give to her evidence is the rule that other testimony must be produced which shall tend to corroborate her. The quantum of it will differ in accordance with the character of the witness and the facts of the particular case. In respect to an adventuress whose air and demeanor upon the witness stand might disclose · her true character, a jury might well hesitate to convict, though supported by abundant circumstances of corroboration. Whether in any given case they shall or do believe the accomplice is wisely by law committed to them."

The letter of the prosecutrix in this case to the appellant, of about April, 1909, which was produced by appellant and required by him to be identified by the prosecutrix, itself shows that she was even at that time deeply in love with him. There is nothing in the letter, as we see, reflecting upon her virtue or her veracity. Instead, it rather confirms both. In connection with it she testified that before she wrote that letter each had declared to the other their affection and love for one another. The letter shows that she was willing and would humble herself to appellant because of her love for him, thereby showing the influence in that way he had upon her. The testimony .of both the other State's witnesses corroborated her that in July, 1909, the appellant was in Erath County on a visit. The picture postcard introduced in evidence is very strong corroborative testimony, in our opinion, not only that the appellant was then in love with and had declared his love for the proxecutrix, but that he had then wooed and won her. His language in the poetry is,

> "*I've won you,* and kissed you, my pretty maid,
> And this ring shall whisper, *he's ever true.*"

It also corroborates her testimony that even if she broke their engagement in November, 1909, that they again became engaged on January 2, 1910, as she testified. The postcard bears evidence on its fact that it was written by appellant to her. It was postmarked by the United States postmaster at Dublin, Texas, in Erath County, on July 31, 1909. It was shown by one if not both of the other State's witnesses that appellant in the spring of 1910, impliedly, if he did not expressly, admit to them that he had sexual intercourse with the prosecuting witness in January, 1910, and that her condition of pregnancy caused by him was known to and discussed by him; that he was then seeking to find someone who would swear that he, such other, had had sexual intercourse with her for which he was willing to pay $25. She had with her while she was testifying on the stand her young baby, born September 25, 1910, about the rec-

ognized time known by all for a child to have been born when sexual intercourse occurred early in January preceding. She testified that that child was the child born to her of the appellant. No objection was made to the testimony at the time. She was also corroborated by both of the said witnesses and all the circumstances shown, that the appellant had been devoted to her, had been continuously waiting upon her since the early April, 1909, with an occasional lovers' quarrel and misunderstanding only coming up between them. It seems that he told both of these State's witnesses, in effect, when they were twitting him about one of these split-ups in the latter part of December, 1909, he said, "That is all right; if I ever go with her again, you may know I am having fun." No one disputes the fact, and the circumstances are convincing of the truth of it, that he did make up with her on January 2, the first Sunday in January, 1910; that the opportunity for the act of sexual intercourse was had by him when she says it occurred on January 9, 1910, and that soon after he gradually began to quit giving any attention to her, and after he found out from her that he had, as we think without doubt, gotten her pregnant, he ceased his attentions altogether to her and went away from the community where he and she lived and remained away some five or six months, in the meantime marrying another.

We have given the testimony careful and thorough consideration, and we are convinced beyond doubt of the guilt of the appellant, the sufficiency of the corroboration in law and that there is no reversible error in this case. As said by Judge McCord, winding up his opinion in the Nash case, supra, 61 Texas Crim. Rep., 259, 134 S. W. Rep., 709, as adopted by Judge Harper, "The defendant is guilty. The law has been satisfied."

The judgment will be affirmed.

*Affirmed.*

[Rehearing denied February 28, 1912.—Reporter.]